JOHN B. ADAMS

v.

MARK P. WELLS, trading, &c., et al.

[Filed November 22d, 1902.]

1. In order to be entitled to give a stop notice, under section 3 of the Mechanics' Lien act (*P. L. of 1898 p. 538*), to the owner to retain a debt owing for labor or materials, &c., the claimant under such a notice must prove that before serving it the contractor had refused, upon demand made, to pay the debt.

2. Under the Lien act, when a final payment comes to be due and no effectual stop notice has been served, the contractor may either collect or assign the final payment. Any subsequently served stop notices operate only to detain what remains in the owner's hands, after deducting the amount of such payment to the contractor and of such assignment by him.

Adams *v.* Wells.

3. The special preference reserved by the last clause of section 6 of the Lien act of 1898 (*P. L. of 1898 p. 540*), can only be allowed to claimants who prove that they did personal labor on the building or that they furnished material therefor. Subcontractors, who are not themselves laborers or furnishers of materials, are not included in the class for whom this special preference is intended.

On bill of interpleader on mechanics' lien contract. On answers and proofs.

*Mr. Lewis Starr,* for the defendant Stoneback.

*Mr. Joshua E. Borton,* for the defendant Scudder.

*Mr. John G. Horner,* for the defendants John Eckstein Beatty and William J. Robinson.

*Mr. Joseph R. Embery* (of the Philadelphia bar), also appeared for John Eckstein Beatty.

GREY, V. C. (orally).

This is an interpleader suit, occasioned by the failure of a building contractor to fully perform his contract filed under the Mechanics' Lien act, and contesting claims of the defendants upon the contract filed. The complainant has obtained a decree of interpleader, and the present phase of the cause is an interpleading between the respective defendants, who say that the fund is a deposit of the contract price paid in by the owner, who had duly filed his building contract, and the defendants each claim payment out of the fund, in priority to the others. The order of priority of these claims is therefore the substantial question to be determined.

The first claimant is Reuben G. Scudder. This claim, it is not disputed, is a rightful claim for material furnished under the contract between Mr. Adams and Wells & Company, the contractor.

There is some dispute whether or not, at the time when Mr. Scudder alleges he made demand for final payment, he had actually fulfilled his contract by the delivery of the last goods.

He was somewhat uncertain as to the particular hour of the final delivery on the 2d day of January, 1902. He said he had so delivered the last of the goods, that he afterwards went over to Philadelphia, to Mr. Wells' office, and made his demand for payment some time in the morning of the 2d day of January, and he could not, with precise definiteness, state at what hour he made the demand, but I think half-past twelve was the latest hour he named. Mr. Wells, on the other hand, testifies that the final deliveries were not completed until two o'clock of the afternoon of the same day, which, if true, would make it appear that Mr. Scudder had demanded payment before he had made final delivery of the goods.

I do not think there is enough certainty about this point, either way, to decide the claim, although the burden is upon Mr. Scudder to establish every essential incident necessary to give him the preference which he asserts.

Mr. Scudder says that at some time during the latter part of the morning he went over to Mr. Wells' office, in one of the office buildings in Philadelphia, and there, he says, he demanded a settlement. When asked, on cross-examination, whether he named, in dollars and cents, the amount due him, he was unable to say what sum of money he did name, although he testifies he did name a sum, and that he named the sum that was due to him, and that the sum was computed on a little memorandum, which was taken over there for the purpose of keeping in memory the exact sum. He said he used that memorandum, but cannot now produce it, because it has been lost. Nor can he now recollect what was the amount of the sum he named to Mr. Wells.

The answer to Mr. Scudder's statement is by Mr. Wells and by his typewriter. They both testify that Mr. Scudder never made any such demand for payment as he testified he made upon Mr. Wells.

It is essentially necessary to Mr. Scudder's case that he should prove that he made a demand upon Mr. Wells for payment of his claim, and was refused payment, before he filed his stop notice. That is the requirement of the statute under which the stop-noticing party acquires his right. It is a purely statutory right, in derogation of the common law, giving to the person

who performs these conditions an especial privilege. The burden of proof, in order to claim this right, is necessarily imposed upon the party who asserts that he performed the conditions. Mr. Scudder, in giving his narration of the place and surroundings at which he made the demand, states that he saw Mr. Wells and his stenographer—a young woman whom he could describe in no other way than she had black hair. He says that he went there on the 2d day of January, 1902. He does not say that he went there at any other time, nor does he leave the matter in any sort of doubt that he claims to have gone on that day, and on no other. His own testimony fixes the day with absolute certainty. If he did not go on that day and make the demand of Mr. Wells in the presence of his stenographer, who could probably have heard it, as he himself says, he evidently did not see them at all.

Mr. Scudder's statement is contradicted by Mr. Wells, who says that he was not in his office at any time on the 2d day of January, 1902. Mr. Wells' story is supported by the stenographer, whose testimony is directly upon the point, because Mr. Scudder says that he made the demand in the presence of the stenographer, and the proof is that the young woman here brought is the only stenographer that Mr. Wells has had in his employ for three or four months before the making of the demand and ever since. The young woman says that she was not in the office on that day. Mr. Scudder does not leave any room for believing that Mr. Wells could be mistaken as to the occasion, because Scudder himself declares that he made the demand, such as it was, of Wells in the presence of the stenographer, and that he had to pass by the stenographer in order to converse with Wells.

I do not see how it is possible to reconcile, in any way, these statements, and I am wholly unable to reconcile them. I notice that counsel, in order to test the testimony of Mr. Wells and the stenographer, cross-examined them as to why it was that they could remember events which took place on a specifically named day. The reasons given by them why the events of the particular day could be stated in detail seem to be entirely natural. The young woman had, for some little time before January 3d,

Adams *v.* Wells.

1902, been off on a holiday trip. On the night of January 1st, 1902, she had attended a masked ball. Those incidents were such as would have made a strong impression of the period on her memory. She came back to Philadelphia on the evening of the 2d day of January, 1902. This is the day on the morning of which Mr. Scudder says he made demand upon Mr. Wells in the presence of the stenographer. The stenographer says that she came directly from her trip back to her home in the evening; that she was not at the office at all on the 2d of January. Mr. Wells also explains his testimony in fixing the events of the 2d day of January by stating the fact that on that day he had an arrangement for a settlement of an important character to be made with other people in New York; that he went to New York for that purpose on January 2d, early in the morning, and did not open his office at all on that day.

It is, however, not necessary that the testimony of these two witnesses should overweigh the testimony of Mr. Scudder on the point. It is enough if they equal it, and I am quite unable to say they do not equal Mr. Scudder's testimony. The burden of proof is upon him. If he does not show, by a preponderance of proof, that he did perform this preliminary condition of making demand of payment, and that it was refused, he does not show compliance with the statutory requirements necessary to enable him to serve the statutory stop notice. He does not show himself to be within that class who have entitled themselves to the statutory preference.

I do not undertake to say that Mr. Scudder testified falsely; there is a wide opportunity for mistake. His confused statement as to the location of the office to which he went as Mr. Wells' office on that day, suggests that, when he sought to make his demand, he might have gone into the wrong office. He does not seem to have had any extended business with Mr. Wells, nor does he testify that he had had any intimate acquaintance with him, nor did he describe the location of his office with precision. Although the young woman, who was unquestionably Mr. Wells' stenographer at the time, was present in court, yet Mr. Scudder did not identify her as the stenographer who was in Mr. Wells'

office when he (Scudder) made his demand. His testimony might be consistent with his having gotten into a wrong office, and not in Mr. Wells' place.

Mr. Scudder must take the responsibility of having failed to establish, by a preponderance of proof, the existence of the facts which are necessary to entitle him to his preference. For this reason Mr. Scudder's claim for a preference as a stop-noticing creditor must be rejected.

The next claim presented is that of John Eckstein Beatty. This is based upon an assignment made by Wells, the contractor, to Beatty, on the 20th day of January, 1902, of $1,500, part of the contract price due, or to become due, to him from Adams. It was agreed between Beatty and Wells that the $1,500 should be advanced in consideration of the giving of the assignment. The assignment was given on its date; $500 was then paid, and the residue, $1,000, within a few days after, and before any other claim was made on the contract price.

The maturing of the final payment was, under the contract, dependent upon the certificate of the architect that the work was completed. On the 7th of April, 1902, this certificate was given, and Mr. Wells, the contractor, and Mr. Adams, the owner, came to a settlement, whereby the sum then due and payable on the contract price to Wells was ascertained to be $2,268, and the final payment was thus matured.

On the following day, the 8th of April, 1902, Beatty served upon Adams a copy of his assignment from Wells of $1,500, part of the money due on the contract price. At this time no other stop notices than Scudder's had previously been served.

The later decisions as to the rights of claimants upon a contract price declare that the legislative purpose is to give to persons entitled, under the Lien act, to serve stop notices an inchoate lien on the liability of the owner under the contract, until that liability matures according to the terms of the contract; such lien to become perfect on service of the stop notice before the liability matures, but to expire on such maturity if no notice has been given. *Slingerland* v. *Binns, 11 Dick. Ch. Rep. 415 (Court of Appeals).* When the final payment matures

and becomes due, it must be applied first to satisfy stop notices previously served, in the order of their priority, and any money thereafter remaining is at the disposal of the contractor, who is entitled to collect and receive the same from the owner. Any stop notice thereafter served operates only upon the moneys due at the time of such service, so far as not assigned by the contractor or detained by previous stop notices. *Taylor* v. *Reed, 52 Atl. Rep. 582 (Supreme Court, 1902, Mr. Justice Pitney).*

Under these rulings, the whole final payment having become due to Wells, the contractor, on the 7th day of April, 1902, the effect of the notice given on the 8th day of April to Mr. Adams of the assignment which Beatty had from Wells for the $1,500, was, in equity, to transfer that much of the final payment to Beatty. The only previous stop notice served was Scudder's. This failed, as is above shown, because of non-observance of the statutory requirements. The stop notices of Stoneback and others were not served until several days after full written notice had been given by Beatty to Adams of his $1,500 assignment from Wells, and are therefore subject to Beatty's claim.

The decision in *Blauvelt* v. *Fuller, 37 Vr. 46 (1901),* as to the $500 portion of the contract price in that case, very nearly coincides with the situation presented by Beatty's claim for the $1,500 on his assignment. In that case the final payment had matured, and after a settlement of accounts between the contractor and owner, $500 was retained by the owner to meet an order given by the contractor. Subsequently, stop notices were served, and they were held to apply only to the residue of the contract price remaining after deducting the $500.

The defendants Stoneback and Robinson, however, contend that, under the operation of section 6 of the Mechanics' Lien act of 1898 *(P. L. of 1898 p. 540),* they are entitled to a preference over Beatty. The words of the last clause under which Stoneback and others claim this preference are as follows:

"Laborers or materialmen giving notices in accordance with the provisions of the third section shall have priority and preference in the disposition of the moneys due and to grow due upon the contract over any persons claiming said moneys or any part thereof by reason of order or orders thereon or assignments thereof."

This clause first appears in the Lien act of 1898. It selects from the persons who, under the terms of the act, are entitled to serve stop notices a smaller class, whose notices, when given in accordance with the provisions of the statute, shall have priority over persons claiming under orders or assignments from the contractor. The class thus selected consists of laborers—that is, those who personally labor on the building, and material-men—that is, those who furnish materials used in the building.

Subcontractors, who are not themselves laborers on the building or furnishers of material for the building, but who, under their subcontracts, employ persons to labor on the building, with materials furnished by them in performance of their subcontracts, were not intended to be included within this preferred class.

When parties who have served stop notices claim the benefit of this special preference, they must prove, by evidence, that their claims are those of laborers on the building or material-men who have furnished materials for the building. It cannot be assumed that they are within this special class. Neither Stoneback nor Robinson has made this necessary proof. Stoneback's bill shows, on its face, that he was a subcontractor, and so does Robinson's. Both were sworn as witnesses, each testified, in general phrase, that he did work on the building, but there was no proof that either worked personally as a laborer. Nor did either show that his claim was for materials furnished. The only item in either claim separable as materials furnished was $320 for forty thousand bricks in Stoneback's claim, which shows, also, that it has been satisfied and paid by an allowance.

The defendant Beatty is entitled to have the amount due on his assignment first paid out of the fund in court.

Under the decisions above referred to, the stop notices of Stoneback and Robinson affect only the portion of the fund remaining after Beatty's assignment has been satisfied. Stoneback's notice was served on the 12th day of April, 1902, and precedes Robinson's, which was served April 14th.

The fund in court is sufficient to pay Beatty in full. The residue is insufficient to satisfy all of Stoneback's claim. He is entitled to the whole of the residue.

The rights of those claimants who filed stop notices after Stoneback need not be considered, as there is no money remaining of the contract price out of which to pay them.